ALBERT BROOKS FRIEDMAN, LTD., Plaintiff-Appellant, v. JOHN MALEVITIS *et al.*, formerly d/b/a Stamos and Malevitis, Ltd., Defendants-Appellees.

First District (5th Division)    No. 1—97—2461

Opinion filed March 26, 1999.—Rehearing denied May 27, 1999.

Albert Brooks Friedman, Ltd., of Chicago, for appellant.

John L. Malevitis, of J.L. Malevitis & Associates, Ltd., of Chicago, appellee *pro se*.

JUSTICE THEIS delivered the opinion of the court:

The issue presented in this appeal is whether a discharged attorney may enforce a contract to split a contingency fee with a newly retained attorney. The circuit court dismissed a breach of contract suit filed on behalf of Albert Brooks Friedman, Ltd., a professional corporation, against attorneys John L. Malevitis and James Stamos, formerly doing business as Stamos and Malevitis, Ltd. Friedman's complaint arose after Friedman's client, Sally Ruecking, discharged Friedman

and hired Stamos and Malevitis, Ltd., to represent her in the same matter while her personal injury lawsuit was pending. After receiving an award of $10,000 as *quantum meruit*, Friedman sought to recover additional attorney fees in the amount of $45,450 under an alleged fee-division agreement negotiated with Stamos on behalf of Stamos and Malevitis individually and as the agents of Ruecking. We affirm.

We turn first to the factual allegations contained in Friedman's complaint. On or about November 27, 1990, Ruecking entered into a contingent fee contract with Albert Brooks Friedman, Ltd., which provided that Friedman would prosecute Ruecking's personal injury matter in exchange for one-third of the amount recovered. Friedman filed a lawsuit and did investigative, research, and discovery work on Ruecking's behalf. In addition, Albert Brooks Friedman, Ltd., possessed a common law retaining lien and a statutory attorney's lien on Ruecking's personal injury matter.

Friedman attached to his complaint a copy of a letter he received, dated November 18, 1991, and signed by Ruecking, in which Ruecking requested that Friedman "transfer" her personal injury case to Malevitis of Stamos and Malevitis. The letter further stated, "Mr. Malevitis will be sending someone over immediately to obtain my file, and to discuss your interest in the case."

Friedman's complaint alleged that Ruecking's letter evidenced Ruecking's designation of Stamos and Malevitis as her agents and authorized them to negotiate on her behalf a division of fees with Friedman. Friedman further alleged that, at the time he received Ruecking's letter of discharge, he possessed the legal right to ask for *quantum meruit* and to collect attorney fees from Ruecking.

Friedman complained that he relied upon the purported agency of Stamos and Malevitis, as expressed in Ruecking's letter of November 18, 1991, to negotiate a fee-division arrangement with them for work he already had performed on Ruecking's behalf. Friedman memorialized this purported fee-division arrangement in a letter dated January 15, 1992, which he alleged constituted an agreement with Friedman on behalf of Stamos and Malevitis individually and acting as agents of Ruecking. Friedman attached a copy of this unsigned letter, dated January 15, 1992, to the complaint. That unsigned letter, bearing an Albert Brooks Friedman, Ltd., letterhead and directed to James Stamos of Stamos and Malevitis, referenced the Ruecking matter. The letter reads as follows:

"Gentlemen:

This will confirm my conversation with Jim Stamos on January 15, 1992. Fees in reference to the above are to be divided as follows:

30% to Albert Brooks Friedman, Ltd. based upon work already completed.

70% to Stamos and Malevitis based upon work to be completed.

If I could be of any assistance, please do not hesitate to contact me."

Allegedly acting in reliance upon the purported agreement expressed in the January 15, 1992, letter, Friedman waived his common law retaining lien and surrendered Ruecking's file to Malevitis.

Malevitis ultimately settled Ruecking's personal injury suit in the amount of $550,000 and, in keeping with his existing contingency fee agreement with Ruecking, received attorney fees in the amount of $183,315. After learning of the settlement, Friedman filed an emergency petition to enforce attorney's lien on February 22, 1995, based upon the same allegations as those contained in his later filed complaint at law, which is the subject of this appeal. On July 25, 1995, the circuit court entered an order stating that it lacked jurisdiction over any claims for attorney fees arising out of the alleged contractual agreement between Albert Brooks Friedman, Ltd., and Stamos and Malevitis. By that same order, the court found that the fair and reasonable *quantum meruit* fee for the legal services of Albert Brooks Friedman, Ltd., was the amount of $10,000. Consequently, Friedman received $10,000.

Friedman's complaint alleged $45,450 remained due him under the terms of his purported fee arrangement with Stamos and Malevitis. Malevitis moved to dismiss Friedman's complaint on grounds that the purported fee-division arrangement was void and unenforceable in that it violated public policy and Rule 1.5(f) of the Rules of Professional Conduct. 134 Ill. 2d R. 1.5(f). Specifically, Malevitis maintained that Friedman's complaint failed to allege the existence of any written consent by Ruecking to the purported fee arrangement.

In support of the motion, Malevitis attached his own affidavit and the affidavit of Ruecking. By her affidavit, Ruecking stated that she discharged Friedman as her attorney in her personal injury lawsuit by letter dated November 18, 1991. Ruecking explained that, after discharging Friedman, she retained Malevitis as her attorney in her personal injury suit. Ruecking averred that she "never agreed, verbally, in writing or otherwise, or consented to and/or approved of any division of fees or fee arrangement between attorney John L. Malevitis and Albert Brooks Friedman." In his affidavit, Malevitis stated he never agreed to a fee-sharing agreement with Friedman.

In reply Friedman attached the evidence deposition of James Stamos. Stamos stated that Malevitis agreed to resolve the issue of Friedman's interest in the Ruecking case rather than to adjudicate any lien immediately or upon resolution of Ruecking's suit. Stamos

averred that, as a result of his conversations with Friedman, he and Friedman agreed to the terms of the January 5, 1992, letter. According to Stamos, Malevitis claimed he had advised Ruecking of the circumstances and advised Stamos that she had no objections to the fee arrangement as expressed in the letter of January 5, 1992.

On June 10, 1997, the circuit court granted Malevitis' motion to dismiss with prejudice, pursuant to section 2—619 of the Code of Civil Procedure. 735 ILCS 5/2—619 (West 1992). Friedman now appeals, claiming the circuit court erred in allowing Malevitis to profit by his own dishonesty by not having his client approve a fee-division agreement entered into by his partner at his request.

■ A section 2—619 motion invokes certain defects or defenses that raise the question of whether the defendant is entitled to judgment as a matter of law. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 485-86, 639 N.E.2d 1282, 1290 (1994). A motion to dismiss pursuant to section 2—619(a)(9) of the Code presents affirmative matters that avoid the legal effect of a plaintiff's claim. *Golden v. Mullen*, 295 Ill. App. 3d 865, 869, 693 N.E.2d 385, 389 (1997). The question for the court under section 2—619 is "whether there exists a genuine issue of material fact precluding dismissal or, absent an issue of material fact, whether dismissal is proper as a matter of law." *Golden*, 295 Ill. App. 3d at 869, 693 N.E.2d at 389. When reviewing motions to dismiss under either section 2—615 or 2—619, our review is *de novo*. *Stephen L. Winternitz, Inc. v. National Bank*, 289 Ill. App. 3d 753, 755, 683 N.E.2d 492, 494 (1997). We must accept as true all well-pleaded facts in the complaint and all reasonable inferences that can be drawn from those facts in the light most favorable to the plaintiff. *Arriola v. Time Insurance Co.*, 296 Ill. App. 3d 303, 306, 694 N.E.2d 649, 651 (1998).

For purposes of his section 2—619 motion, Malevitis claimed that the purported oral fee agreement was void and unenforceable because it violated public policy and Rule 1.5(f) of the Rules of Professional Conduct. 134 Ill. 2d R. 1.5(f). Malevitis further maintained that Friedman was entitled to no fees based upon his attempt to enforce the agreement.

■ The question of whether a contract is unenforceable as a matter of public policy is a legal conclusion (*Zeigler v. Illinois Trust & Savings Bank*, 245 Ill. 180, 91 N.E. 1041 (1910)) and turns on the particular facts and circumstances of each case. *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 341, 537 N.E.2d 730, 734 (1989). Generally, courts will not enforce a private agreement that is contrary to public policy. *O'Hara*, 127 Ill. 2d at 341, 537 N.E.2d at 734. The public policy of this state is reflected in its constitution, its statutes and its judicial decisions. *O'Hara*, 127 Ill. 2d at 341, 537 N.E.2d at

734. A court will not declare a contract illegal unless it expressly contravenes the law or a known public policy of this state. *Schnieder-jon v. Krupa*, 130 Ill. App. 3d 656, 659, 474 N.E.2d 805, 808 (1985). Supreme court rules have the force of law and are indicative of public policy in the area of attorney conduct. *Marvin N. Benn & Associates, Ltd. v. Nelsen Steel & Wire, Inc.*, 107 Ill. App. 3d 442, 447, 437 N.E.2d 900, 904 (1982).

First, we must examine the public policy and the law of this state, which govern the fees a discharged attorney may recover. Rules 1.5(f) and 1.5(g) of the Rules of Professional Conduct (134 Ill. 2d Rs. 1.5(f), (g)) in pertinent part provide:

> "(f) *** [A] lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a writing which discloses:
>> (1) that a division of fees will be made;
>> (2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division; and
>> (3) the responsibility to be assumed by the other lawyer for performance of the legal services in question.
>
> (g) A division of fees shall be made in proportion to the services performed and responsibility assumed by each lawyer, except where the primary service performed by one lawyer is the referral of the client to another lawyer and
>> (1) the receiving lawyer discloses that the referring lawyer has received or will receive economic benefit from the referral and the extent and basis of such economic benefit, and
>> (2) the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as would a partner of the receiving lawyer."

■ Rules 1.5(f) and 1.5(g) are expressions of public policy. Framed as a general prohibition against fee sharing among lawyers not in the same firm, Rules 1.5(f) and 1.5(g) carve out certain exceptions to that prohibition. Rule 1.5(f) provides for fee sharing, in proportion to the services performed and the responsibility assumed by each, among lawyers who are not members of the same firm, but who are contemporaneously employed by the same client. The rule itself speaks of the client's consent to "employment of the other lawyer." 134 Ill. 2d R. 1.5(f). By requiring the client's signed consent after disclosure of the arrangement, the rule underscores the import of the client's right to representation of her own choosing. Rule 1.5(g) further provides for fee-sharing agreements among lawyers who are not members of the same firm where the primary service performed by one lawyer is the referral of the client to another lawyer.

The client-centered focus of Rule 1.5 is the most recent expression of the long-standing public policy of this state. The rule's historical antecedents demonstrate that the client's rights rather than the lawyer's remedies have always been this state's greatest concern. Prior to July 1, 1980, the effective date of the Illinois Code of Professional Responsibility, intra-attorney fee-sharing agreements based solely upon a client referral were unenforceable on public policy grounds. *Corti v. Fleisher*, 93 Ill. App. 3d 517, 417 N.E.2d 764 (1981). The Illinois Supreme Court changed public policy when it adopted Disciplinary Rule 2—107 (107 Ill. 2d R. 2—107), which expressly sanctioned fee-sharing referral agreements where the only service provided by the referring attorney was the mere referral of the client. *Holstein v. Grossman*, 246 Ill. App. 3d 719, 732, 616 N.E.2d 1224, 1233 (1993).

Though Disciplinary Rule 2—107 removed the prohibition against fee sharing based solely on a client referral, it retained safeguards designed to protect the client: client consent in writing after disclosure was required. *Holstein*, 246 Ill. App. 3d at 733-34, 616 N.E.2d at 1234. Thus, public policy still required that the actual effect of fee-sharing agreements on the clients themselves remain the paramount concern. *Holstein*, 246 Ill. App. 3d at 733-34, 616 N.E.2d at 1234. The client's right to counsel of her choosing was ensured through the signed writing requirement. Rules 1.5(f) through (j) codified, in substantially the same form, Disciplinary Rule 2—107 of the Illinois Code of Professional Responsibility, retaining its concern for the client's best interests.

■ This same concern is reflected in the common law rules that govern the compensation of a discharged attorney. A client may discharge her attorney at any time, with or without cause. *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 227-28, 399 N.E.2d 969, 974 (1979). When a client terminates her attorney, the contingent-fee contract ceases to exist, and the contingency term is no longer operative. *In re Estate of Callahan*, 144 Ill. 2d 32, 40, 578 N.E.2d 985, 988 (1991). A discharged attorney may be compensated for the services rendered before the discharge on a *quantum meruit* basis. *Rhoades*, 78 Ill. 2d at 230, 399 N.E.2d at 975. *Quantum meruit* literally means "as much as he deserves." *First National Bank v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 365, 688 N.E.2d 1179, 1185 (1997). In *quantum meruit* recovery, the former client is liable for the reasonable value of the services received during the attorney's employment. *Callahan*, 144 Ill. 2d at 41, 578 N.E.2d at 988-89. It is the client's rights, not the attorney's remedies, that are central.

■ A single focus animates our rules of professional conduct and

the common law of this state: the client's best interest. See *Corti v. Fleisher*, 93 Ill. App. 3d 517, 417 N.E.2d 764 (1981). The right of the client to retain counsel of her own choosing and to pay fees commensurate with the services rendered and the responsibility assumed are of paramount concern. Using the client's best interest as our compass, we turn now to the merits of Friedman's complaint. Friedman did not set forth any facts suggesting that he enjoyed employment by Ruecking contemporaneous with that of Stamos and Malevitis. Rather, Friedman conceded the fact and timing of his discharge. That Ruecking did not sign a written consent as required by Rule 1.5(f) is of no moment because Friedman could not, and did not, allege facts attendant to joint venture, association, or referral. Friedman's claim is not a division of fees for shared responsibility for performance of legal services.

■ The particular character of Friedman's contract claim becomes evident when one contrasts the facts alleged in his complaint with those of the cases he invokes. Friedman's complaint does not allege facts giving rise to a cause of action against Malevitis for breach of terms of an implied contract existing by virtue of their employment by the same law firm. See *Stefanich, McGarry, Wols & Okrei, Ltd. v. Hoeflich*, 260 Ill. App. 3d 758, 632 N.E.2d 1064 (1994). Friedman does not allege that Ruecking agreed to retain him along with Malevitis after he fully disclosed the fee arrangement. See *Schniederjon v. Krupa*, 130 Ill. App. 3d 656, 474 N.E.2d 805 (1985). His complaint contains no allegations of Ruecking's consent in writing to joint representation so as to invoke substantial compliance. See *Phillips v. Joyce*, 169 Ill. App. 3d 520, 523 N.E.2d 933 (1988); *Holstein v. Grossman*, 246 Ill. App. 3d 719, 616 N.E.2d 1224 (1993). Nor does he allege joint venture, breach of fiduciary duty, or interference with economic advantage. See *Davies v. Grauer*, 291 Ill. App. 3d 863, 684 N.E.2d 924 (1997) (joint venture alleged); *Larry Karchmar, Ltd. v. Nevoral*, 302 Ill. App. 3d 951 (1999) (breach of fiduciary duty and interference with economic advantage alleged). ·

Friedman does not seek *quantum meruit* in an amount equal to the reasonable value of the services Ruecking received from him during his employment by her. Significantly, the complaint does not allege the agreement was a contract for the payment of the client's obligation to pay quantum meruit. See *Paul v. Neely*, 155 Ill. App. 3d 241, 508 N.E.2d 401 (1987). Nor does Friedman claim that by the agreement Malevitis undertook to answer for the *quantum meruit* fees Ruecking owed Friedman. See *Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040, 700 N.E.2d 202 (1998). Friedman does not dispute Ruecking's obligation was satisfied by the $10,000 award.

Rather, Friedman complains that Malevitis owes him $45,450 in additional fees under the terms of the purported fee-division agreement he entered into with Stamos and Malevitis, Ltd.

We find the facts of this case closely analogous to those of *Leoris v. Dicks*, 150 Ill. App. 3d 350, 501 N.E.2d 901 (1986). Attorney Leoris was retained by a client to represent him in his personal injury claim. The client agreed to pay Leoris fees equal to 33% of the client's recovery. The attorney filed a complaint on behalf of the client and commenced investigation.

Approximately six months later, the client retained attorney Dicks and discharged attorney Leoris, without cause. The client directed Leoris to turn over his file to Dicks. Leoris alleged that he and Dicks entered into an oral agreement, which provided that, in consideration of Leoris turning over his file to Dicks, Dicks would pay Leoris 33% of whatever fee he received. The case was settled, and Dicks received a fee, of which he did not pay Leoris any part.

Leoris filed a complaint against Dicks for breach of contract. On appeal, the court concluded that the trial court had properly dismissed Leoris' complaint. In so doing, the panel opined that "it is clear that Illinois public policy prohibits a discharged lawyer from receiving a percentage-based fee where said fee was not related to the value of services rendered, the client does not consent to the fee arrangement, and the discharged attorney has no responsibility for the pending litigation." *Leoris*, 150 Ill. App. 3d at 353, 501 N.E.2d at 903.

In this instance, Ruecking submitted an affidavit in which she denied any knowledge of or agreement to, written or otherwise, the purported fee-sharing agreement that is the basis of Friedman's complaint. Simply put, Ruecking fired Friedman and hired Malevitis. A fee-sharing agreement between the discharged attorney and the newly retained attorney offends the client's right to discharge her attorney, to be represented by the counsel of her choosing, and to pay fees based upon the services contracted for and rendered. The general prohibition of Rule 1.5(f) against the division of fees with a lawyer who is not in the same firm applies. Accordingly, Friedman's agreement to share a portion of Malevitis' contingent fee violates public policy and is unenforceable. Consequently, the circuit court correctly dismissed Friedman's contractual complaint pursuant to section 2—619.

■ Finally, we turn to Friedman's claim that the circuit court erred in allowing Malevitis to profit through his own dishonesty by not having his client approve a fee-division agreement entered into by his partner at his request. Recently, courts have recognized breach of fiduciary duty and interference with prospective economic advantage as alternative theories under which an attorney may proceed against

another attorney in a fee dispute. See *Holstein v. Grossman*, 246 Ill. App. 3d 719, 616 N.E.2d 1224 (1993); *Anderson v. Anchor Organization for Health Maintenance*, 274 Ill. App. 3d 1001, 654 N.E.2d 675 (1995). However, such actions are distinct from contract actions where the primary concern is the effect of the agreement on the client. *Holstein*, 246 Ill. App. 3d at 737-41, 616 N.E.2d at 1235-38.

Here, Friedman's claim of estoppel has no force with respect to the facts and allegations contained in his complaint. In *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 349, 537 N.E.2d 730, 738 (1989), our supreme court explained that "a party to a contract which is contrary to public policy is not precluded from raising its illegality as a defense." As we have previously emphasized, "[o]ur paramount concern must be the effect these fee-sharing agreements have on the clients, not the attorneys involved." *Holstein*, 246 Ill. App. 3d at 737, 616 N.E.2d at 1236; *Schniederjon v. Krupa*, 162 Ill. App. 3d 192, 195, 514 N.E.2d 1200, 1202 (1987). To permit Friedman to recover fees he did not earn would ignore the fact that he was terminated by Ruecking without performing the services for which he now claims a right to compensation. See *Hofreiter v. Leigh*, 124 Ill. App. 3d 1052, 1055-57, 465 N.E.2d 110, 112-13 (1984).

Accordingly, we affirm the trial court's dismissal of Friedman's complaint for additional fees.

Affirmed.

HOURIHANE, P.J., and HARTMAN, J., concur.