RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JEANNETTE MARTELLO,

        *Plaintiff-Appellant,*

    *v.*

  No. 12-5729

JOSHUA SANTANA, et al.,

        *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:11-cv-00093—Karl S. Forester, District Judge.

Argued: March 12, 2013

Decided and Filed: April 9, 2013

Before: MERRITT, MARTIN, and CLAY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Jeremy S. Rogers, DINSMORE & SHOHL LLP, Louisville, Kentucky, for
Appellant. Larry C. Deener, LANDRUM & SHOUSE LLP, Lexington, Kentucky, for
Appellees. **ON BRIEF:** Jeremy S. Rogers, DINSMORE & SHOHL LLP, Louisville,
Kentucky, for Appellant. Larry C. Deener, Elizabeth A. Deener, LANDRUM &
SHOUSE LLP, Lexington, Kentucky, for Appellees.

───────────────

## OPINION

───────────────

BOYCE F. MARTIN, JR., Circuit Judge. This case arises out of a contract
dispute between Jeannette Martello, a medical doctor with a law degree, and Joshua
Santana, a Kentucky attorney. The district court granted summary judgment for Santana
on Martello's breach of contract, fraud and fraudulent concealment of settlement, and

breach of fiduciary duty claims.  Martello now appeals.  For the following reasons we **AFFIRM** the district court's judgment.

I.

Martello is a doctor who also has a law degree from University of California at Berkeley, Boalt Hall School of Law.  Despite taking the bar exam on four separate occasions in Kentucky and New York, Martello has never passed the bar exam and does not practice law.  Although she never passed the bar exam, in March 1997 Martello passed the Multistate Professional Responsibility Examination.  Beginning in 1991, Martello started reviewing medical malpractice cases for Santana and his law firm.  Martello described the work she did for Santana as "medical/legal consulting work" that included "the acquisition and review of pertinent medical records; the formulation of opinions regarding whether medical negligence existed; the identification of possible defendants; . . . education and consultation with attorneys and expert witnesses . . . ."  Santana typically paid Martello an hourly rate for her work, but she alleges that they changed the fee arrangement for three specific cases: the Howard/Lee case, the Davis case, and the Tinker case.

The Howard/Lee case arose in 1993 when Martello treated, in her capacity as a physician, "a toddler who became irreversibly brain damaged after a twenty-minute minor surgery."  The toddler's mother asked Martello to help her find out why the surgery went wrong, and Martello introduced her to Santana.  Martello's complaint states that she asked "Santana if there was any other working arrangement they could enter into besides that of an hourly rate reimbursement.  After all, but for her introducing Santana to the family, Santana would never have met them."  Santana agreed and hand wrote an agreement (later memorialized in a typed letter) stating that he would pay Martello 20 percent of his fee if the case settled before the filing of the lawsuit and 25 percent of his fee if the case settled after the filing of the lawsuit.  Martello alleges that the handwritten document was also intended to cover consulting on future cases.

However, on March 31, 1997, Santana sent a letter to Martello about the payment arrangement for the Howard/Lee case stating that:

> As we have discussed on several occasions, the Kentucky canons of ethics prohibit the payment of your fees for assisting in the prosecution of the referenced matter on a contingency basis. It is my understanding that in preparing for the ethics portion of the bar exam this issue came up and you have reviewed the law and are in agreement with my reading of the canons. Accordingly, it is my understanding that you will be billing us on an hourly basis for work associated with this claim . . . .

Martello claims that Santana told her to fabricate her time to make it look like she worked on an hourly basis, but with the result being she earned the equivalent of what she would have received under the contract. The Howard/Lee case settled in the spring of 1997 for $400,000 and Santana's firm received $160,000. This settlement would have entitled Martello to 25 percent of the firm's fee, or $40,000, under Santana and Martello's contract. Santana ultimately paid Martello $36,150.56 because, in a letter to Martello on June 17, 1997, Santana claimed there were additional costs that reduced her share of the fee. Martello now claims there were no additional costs and that Santana breached their contract.

The Davis case began in 1996 when Martello treated "a young man who underwent the surgical removal of the majority of dead lower leg musculature." The patient's mother asked if Martello could help her find answers to how her son's muscle had died and whether anything could have been done to prevent it. She gave Martello permission to speak with Santana. On July 1, 1996, Santana sent a letter to Martello memorializing an oral agreement and agreeing to pay Martello 25 percent of the net fee recovered by Santana if the case settled before trial and 33.3 percent of the net fee if the case went to trial and Santana won a jury verdict. Santana sent this letter almost eight months before he sent the letter discussing ethical issues with contingency fees in the Howard/Lee case. Despite receiving Santana's letter regarding the ethical problems of fee-sharing in the Howard/Lee case during the course of the Davis litigation, Martello alleges that she did not think the letter affected her contingency fees for the Davis case.

The Davis case settled in 1999, and Santana received $67,556.85, meaning that under the contract Martello would have been entitled to 25 percent of Santana's fee, or $16,889.21. Martello received $5,000 for her work. She alleges that when she inquired about the settlement amount, Santana said he could not tell her the amount because there was a gag order in place, but that he had taken care of her "like he always had." Santana responds that Martello never submitted hourly statements for her work and he felt the $5,000 was "considered to be an equitable and agreed determination of the services rendered."

The final case at issue is the Tinker case, a 1997 case involving a child who had his arm amputated. Just as in the other two cases, the family asked Martello for assistance and she introduced the family to Santana. Unlike the other two agreements, there is no letter from Santana providing the terms of a fee arrangement, and Martello vaguely alleges only that "Santana agreed to the contingency fee relationship which had been memorialized in the hand-written agreement [from the Howard/Lee case] and prior letter agreements." The Tinker case had two settlements. The first, in November of 1998, resulted in a $500,000 fee for Santana's firm, and the second, in July of 2000, provided Santana with an $83,333.33 fee. Martello alleges she was entitled to over $100,000 for her work on the case, but instead she received $17,000 from the first settlement, and $10,000 from the second settlement. As in the Davis case, Martello alleges that she asked Santana about the settlement amounts and he told her a gag order prevented him from disclosing the amount, but said "[d]on't worry. I took care of you."

In 2005, Martello started researching for a medical article and contacted the Tinker family to see how their child was doing. During the conversation, the Tinker family mentioned that the case settled for around 1.75 million dollars and that Santana's firm probably received around $700,000 as a fee. When Martello found this out, she immediately contacted the Davis family, who told her they thought Santana received around $70,000 for their case.

The day after discovering the settlement amount in the Davis case, Martello hired an attorney and asked him to investigate whether she had been properly paid. In

February 2006, Martello signed a confidentiality agreement with Santana and in March 2006, Santana's attorney forwarded documents regarding the fee agreements and the cases' settlement amounts, which are now, contrary to the confidentiality agreement, part of the record in this case.

During the course of the litigation, Martello and Santana signed two tolling agreements relating to the statute of limitations. The first agreement, in November 2005, tolled the statute of limitations for all claims from July 11, 2005, through January 1, 2006. The second agreement tolled the statute of limitations for all claims from June 1, 2005, through April 1, 2006, a total of ten months.

On March 7, 2011, Martello filed a complaint in the United States District Court for the Eastern District of Kentucky. The complaint Martello filed *pro se* was over forty-five pages. On the motion for summary judgment, the district court broke the complaint into three main claims: (1) a breach of the oral and written contracts for the three cases; (2) fraud/fraudulent concealment of the settlement and legal fee amounts for each of the three cases; and (3) a breach of fiduciary duty to Martello by failing to disclose the settlement and legal fee amounts.

Santana moved for summary judgment and the district court granted the motion in June 2012. The district court determined that Martello's contract claims were barred because the contracts were void as against public policy, while her fraud claims, even accepting the tolling agreements, were barred by the statute of limitations. The district court also granted summary judgment on the fiduciary claims. Central to its breach of contract determination was the district court's belief that the Kentucky Rules of Professional Conduct inform public policy, and that Martello's agreements with Santana violated Rule 5.4. SCR 3.130-5.4. Martello appeals the district court's decision only on the breach of contract and fraud claims.

II.

We review a district court's grant of summary judgment *de novo*. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir.2010) (citation omitted). Summary judgment is

proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must consider the facts and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

III.

Martello argues that the district court erred in holding that the agreements between her and Santana are void as against Kentucky's public policy for three reasons: first, because the Kentucky Rules of Professional Conduct apply only to Kentucky lawyers, they do not bind Martello, a non-lawyer; second, the contracts between Martello and Santana fall within the exception to the Kentucky Rules of Professional Conduct; third, voiding the contracts would provide a windfall to Santana.

Courts may void contracts that violate law or public policy. *Smith v. The Ferncliff*, 306 U.S. 446, 450 (1939); *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 438 (6th Cir. 2006). Martello argues that public policy can only be created by the Kentucky Legislature and not by the Supreme Court of Kentucky. However, Kentucky courts have held that, in the absence of legislative guidance, courts may determine public policy. *Yeager v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005) ("[A] court may refuse to enforce a contract on grounds of illegality where the contract has a direct objective or purpose that violates the federal or state Constitution, a statute, an ordinance, or the common law.") (citing *Zeitz v. Foley*, 264 S.W.2d 267, 268 (Ky. 1954)); *Giuliani v. Guiler*, 951 S.W.2d 318, 321 (Ky. 1997) ("In the absence of a legislative decree, courts may adopt and apply public policy principles . . . .") (citing *Owens v. Clemons*, 408 S.W.2d 642 (Ky. 1966)). The Restatement (Second) of Contracts section 178 further supports this proposition by stating that a term is unenforceable as against public policy "if legislation provides it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of such terms." Restatement (Second) of Contracts § 178 (1981). The Restatement's comments define legislation "in the broadest sense to include any fixed text enacted by a body with

authority to promulgate rules, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them." *Id*.

The Kentucky bar is a mandatory unified bar and the Kentucky Rules of Professional Conduct are public policy set by the Kentucky Supreme Court. *Ex parte Auditor of Pub. Accounts*, 609 S.W.2d 682, 689 (Ky. 1980). These attorney standards are not created only "for the private benefit of the legal community." *Id*. (noting the Kentucky Bar Association's mission is to maintain "a high standard of professional competence" and help promote improvement of the judicial system); *Kentucky Bar Ass'n v. Chesley*, 2011-SC-000382-KB, 2013 WL 1197510 (Ky. Mar. 21, 2013). The Kentucky Rules of Professional Conduct require lawyers to meet many ethical standards to ensure they properly represent their clients, the public. SCR 3.130 (preamble). Under Kentucky Rule of Professional Conduct 5.4 "[a] lawyer or law firm shall not share legal fees with a nonlawyer . . . ." *Id*. at 3.130-5.4 (professional independence). Here, Martello was not an attorney at any point during her work with Santana. She has a law degree, but has never been admitted to any state's bar. Thus, the fee-sharing contracts violate Rule 5.4.

Martello tries to argue that she fell into Rule 5.4(a)(3)'s exception for non-lawyer employees. *Id*. at 3.130-5.4(a)(3)  ("[A] lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement . . . ."). Here, there is no evidence that Santana employed Martello; rather, it appears that Santana contracted with Martello as an independent consultant or contractor during the entirety of their business relationship.

Martello tries to support her argument by relying on Kentucky Bar Association Ethics Opinion 394, an opinion released in response to the American Bar Association's formal opinion 87-354. The ABA's opinion considers situations where a client asks a lawyer to use a particular consultant who contracts on a contingent-fee basis, or where a consultant employs a lawyer and supplies that lawyer with expert witnesses. ABA Comm. On Ethics & Prof'l Responsibility, Formal op. 353 (1987). The ABA concluded that those specific situations would violate the model rules. *Id.* Here, however, neither

of those situations are before us, and so Opinion 394 is not directly on point.  In answering the question of whether a lawyer may knowingly present testimony of an expert witness who is being compensated on a contingent fee basis, the Kentucky Ethics opinion answers: "No in cases where the support services include the provision of expert witness testimony or in arrangements that involve the splitting of legal fees with a nonlawyer."  KBA Ethics op. 394 (1996).  Even if the opinion applies to Martello, it is to her detriment, because this Court considers her relationship with Santana to be a "splitting of legal fees with a nonlawyer."  *Id.*

Martello asserts that voiding these contracts would create a windfall for Santana at Martello's expense.  This argument, while possibly true, is unpersuasive.  The Rules of Professional Conduct were not created to protect non-lawyers who enter into contracts with attorneys, but were instead designed to ensure both that the judicial process is ethical and to protect potential clients.  Furthermore, Martello was aware of these ethics rules, both because of her having taken and passed the Multistate Professional Responsibility Examination, and because of Santana's letter to her as of March 31, 1997.

IV.

Martello argues that the district court erred in finding that her fraud and fraudulent concealment claims were time-barred.  State law determines the length of the statute of limitations. *Winnett v. Caterpillar*, *Inc.*, 609 F.3d 404, 408–09 (6th Cir. 2010). In Kentucky, an action for relief or damages for fraud must be commenced within five years of the cause of action accruing.  Ky. Rev. Stat. Ann. § 413.120 (West 2013). Although Kentucky law sets the length of the statute of limitations, federal law establishes the date that the statute of limitations begins to run.  *Winnett*, 609 F.3d at 408–09.  Here, the statute of limitations began to run in federal and state court upon discovery of the fraud or when the plaintiff, through the exercise of reasonable diligence, should have discovered the fraud.  *Id*. (citing *Noble v. Chrysler Motors Corp*., 32 F.3d 997, 1000 (6th Cir. 1994)) (the statute of limitations begins to run "when the claimant discovers or in the exercise of reasonable diligence should have discovered the acts constituting the alleged violation").

The district court found that Martello should have had reason to investigate Santana's payments, excluding the last Tinker payment, by August 1999, making her claims time-barred. Martello disagrees, arguing that the district court ruled entirely on disputed facts and did not consider the tolling agreement. We, however, agree with the district court's analysis.

For the Howard/Lee contract, Martello alleges Santana should have paid her $40,000 but that Santana fraudulently reduced her fee by claiming that there were additional attorney costs. Martello says she did not discover this fraud until 2005 and thus her claim is not barred. We do not agree. Santana paid Martello a sum of $36,150.56 on June 17, 1997. By this time, Martello had received the letter from Santana discussing the ethics issues, thus alerting her to potential problems with her fee. Furthermore, in Martello's complaint and briefs she states that, after Santana sent the letter, he told her to make up hours to have her hourly payment equal the previously agreed-upon contingency fee amount. This falsification should have made Martello question Santana's moral fortitude and the legality of the agreement. The district court found she should have been diligent in seeking payment. There was enough wrong with the contract and the way Santana dealt with the contract to require more investigation after she received the 1997 payment for her work in the Howard/Lee case.

Even if the circumstances surrounding the Howard/Lee case did not make Martello aware of potential fraud in 1997, she should have become suspicious by the time she received payment for the Davis case. In August 1999, Martello received $5,000 for her work and alleges that when she asked Santana about the settlement he told her there was a "gag order" for the settlement preventing her from knowing whether Santana's representations were untrue. Martello tries to argue there are disputed issues of fact because she says that Santana said there was a gag order, while Santana denies calling it a gag order but says he told her there was a confidentiality agreement in place. Martello's arguments are not persuasive. Regardless of whether Santana said "gag order" or "confidentiality agreement," it is not an excuse for failing to investigate whether he was faithful to the agreement. Martello knew, or should have known, that

there were ethical issues surrounding their contingency fee agreement and that Santana had recommended she fabricate her hours in the Howard/Lee case. When Santana provided her with $5,000 and no explanation of how he computed the sum, it is likely that a reasonably diligent person would have taken actions to ensure proper payment. Martello could have hired an attorney to help her navigate the situation. She was not totally helpless and did not need to rely entirely on Santana's words. If Martello should have discovered the fraud by August 1999, then the latest date Martello could have brought the case would have been August 2004. The claims are time-barred.

The same analysis applies to the Tinker case. Martello received her first payment of $17,600 in December 1998. By this time, Martello should have inquired as to how Santana computed the payments, particularly given that this contract was an allegedly oral contract for a contingency payment and was entered into after having received Santana's letter on the ethical issues. Furthermore, by December 1998, Martello had allegedly fabricated bills at Santana's request and had also received payments without any proof that the payments were proper. Martello should have diligently investigated soon after the December 1998 payment and thus, the claim is time-barred. The same analysis applies to the second Tinker payment in August 2000 of $10,000. We agree with the district court that, by this point, Martello should have discovered the fraud. The claim for this payment is time-barred as well.

Martello argues that Santana's fraudulent concealment of the settlement payments tolled her statute of limitations. She relies on Kentucky Revised Statute section 413.190(2), which tolls the statute of limitations if the defendant absconds or conceals "or by any other indirect means obstructs the prosecution of the action." Ky. Rev. Stat. Ann. § 413.190(2) (West 2013). However, a plaintiff must also show evidence of due diligence to bring a successful fraudulent-concealment claim. *Hoover v. Langston Equip. Assocs.*, Inc., 958 F.2d. 742, 745 n.1 (6th Cir. 1992) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)). Martello has not shown due diligence here.

Martello also contests the district court's holding that her breach of contract claims are time-barred.  It is not necessary to consider this argument because Martello's breach of contract claims are void as against public policy.

V.

For the reasons above, we **AFFIRM** the district court's judgment.