No. 12-0206 – *Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP*

**FILED**

**June 14, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, concurring, and DAVIS, Justice, joining:

While I agree with the decision reached by the majority to affirm the trial court's grant of summary judgment, I find it necessary to write separately to fault the majority for its absolute failure to recognize the critical need–as the body charged with the responsibility to both oversee and enforce this state's rules of professional conduct[1]–to address the illegality of a fee-sharing agreement between a lawyer and a nonlawyer. From the outset of this case, the respondents sought to dismiss the case on the grounds that the alleged fee-sharing agreement was an illegal contract and, thus, unenforceable. *See* Syllabus *Ben Lomond Co. v. McNabb*, 109 W.Va. 142, 153 S.E. 905 (1930) (holding that contracts aimed at accomplishing fraudulent or illegal purposes are unenforceable). In denying the motion, the trial court found the lack of precedent on the issue to be determinative.[2] Despite

---

[1]*See* Syl. Pt. 3, in part, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984) (recognizing that "[t]his Court is the final arbiter of legal ethics problems").

[2]As further support its ruling, the trial court wrongly relied upon *Watson v. Pietranton*, 178 W.Va. 799, 364 S.E.2d 812 (1987). That case, which upheld a fee-splitting agreement between *lawyers,* is both factually and legally inapposite. Fee-sharing agreements between lawyers and nonlawyers, as is the case here, invoke distinct ethical issues which have at their core the protection of the public. As discussed within this concurrence, it is that crucial need to protect the public's interest which regularly compels the conclusion that fee-sharing
(continued...)

1

the clear invitation from the trial court to resolve this previously unaddressed issue,[3] the

majority opted not to decide that a fee-sharing agreement between a lawyer and a nonlawyer

that is in violation of Rule 5.4 of the Rules of Professional Conduct is unenforceable as being

contrary to the public policy of this state. In so doing, I believe that the majority did a serious

disservice to both the bench and the bar of this state.

In resolving whether the violation of a rule of professional conduct constitutes

a public policy violation, the trial court stated:

> The court is of the opinion, then, that the *W.Va. Rules of Professional Conduct* do not amount to positive statements of the law or of public policy sufficient to render the alleged fee-sharing agreement between Gaddy and Defendants void and unenforceable. In other words, these words do not define "illegal conduct" but do define "unethical conduct" for which an attorney may be disciplined or sanctioned by the Supreme Court of Appeals.

Numerous other courts, when presented with the issue of whether rules which govern

---

[2](...continued)
agreements between lawyers and nonlawyers violate public policy and are thus unenforceable as illegal agreements.

[3]While the grant of summary judgment was on different grounds, this Court was free to affirm the lower court's ruling on grounds other than those relied upon by the trial court. *See Schmehl v. Helton*, 222 W.Va. 98, 106 n.7, 662 S.E.2d 697, 705 n.7 (2008) ("[T]his Court may in any event affirm the circuit court on any proper basis, whether relied upon by the circuit court or not."); *Murphy v. Smallridge*, 196 W.Va. 35, 36-37, 468 S.E.2d 167, 168-69 (1996) ("An appellate court is not limited to the legal grounds relied upon by the circuit court, but it may affirm or reverse a decision on any independently sufficient ground that has adequate support.").

attorney conduct constitute statements of public policy, have resoundingly determined that rules of professional conduct contain explicit declarations of a state's public policy. *See Fields v. Ratfield*, No. A132766, 2012 WL 5359775 at *9 (Cal. App. 2012) ("The Rules of Professional Conduct are not only ethical standards to guide the conduct of members of the bar; but they also serve as an expression of public policy to protect the public.") (internal quotation marks omitted); *Cruse v. O'Quinn*, 273 S.W.3d 766, 776 (Tex. App. 2008) (finding that disciplinary rules constitute an expression of Texas public policy on issue of fee-sharing agreements); *Evans & Luptak, PLC v. Lizza*, 650 N.W.2d 364, 370 (Mich. App. 2002) (recognizing "fundamental principle that contracts that violate our ethical rules violate our public policy and therefore are unenforceable"); *Brandon v. Newman*, 532 S.E.2d 747, 747 (Ga. App. 2000) (upholding trial court's ruling that state bar disciplinary provisions establish public policy of disapproving of fee-sharing agreements with nonlawyers); *Albert Brooks Friedman, Ltd. v. Malevitis*, 710 N.E.2d 843, 846 (Ill. App. 1999) ("Supreme court rules have the force of law and are indicative of public policy in the area of attorney conduct").

In *Martello v. Santana*, 713 F.3d 309 (6th Cir. 2013), the Sixth Circuit Court of Appeals recently affirmed the district court's decision that a fee-sharing contract between a physician and an attorney was unenforceable as being void against public policy. As the appellate court related, "[c]entral to its breach of contract determination was the district court's belief that the Kentucky Rules of Professional Conduct inform public policy, and that

3

Martello's agreements with Santana violated Rule 5.4" which bars fee agreements between lawyers and nonlawyers.[4]  713 F.3d at 312-13.  Specifically rejecting the appellant's argument that "public policy can only be created by the Kentucky Legislature," the Sixth Circuit reasoned that "the Kentucky Rules of Professional Conduct are public policy set by the Kentucky Supreme Court." *Id.* at 313.  As further support for its conclusion, the Sixth Circuit observed that the Restatement (Second) of Contracts, in referring to the use of legislation to identify public policy violations, defines "legislation 'in the broadest sense to include any fixed text enacted by a body with authority to promulgate rules. . . .'" *Id.* (quoting Restatement (Second) of Contracts § 178 cmt. (1981)).

Addressing the issue of whether fee-sharing agreements between lawyers and nonlawyers violate public policy, the Supreme Court of Indiana reasoned as follows in *Trotter v. Nelson*, 684 N.E.2d 1150 (Ind. 1997), *abrogated on other grounds by Liggett v. Young,* 877 N.E.2d 178 (Ind. 2007):

> The Rules of Professional Conduct, as enacted by this Court, contain both implicit and explicit declarations of public policy.  The Indiana Rules of Professional Conduct exist, to a large extent, as a means of protecting the interests of the public as potential clients.  "These Rules and this Court's willingness to enforce them help ensure that the public is well served by the

---

[4]Rule 5.4 of the Kentucky Rules of Professional Conduct mirrors this Court's Rule 5.4, a codification of the Model Rules of Professional Conduct adopted by the ABA, which provides in pertinent part that "[a] lawyer or law firm shall not share legal fees with a nonlawyer. . . ."  W.Va. R. Prof'l Cond. 5.4.

4

bar. Forces that undermine the standards on which the Rules of Professional Conduct are founded disserve the public by weakening the client-lawyer relationship.

*Id*. at 1153 (footnote and internal citation omitted). Continuing its discussion, the Court in

*Trotter* underscored the heightened import of the Rules that are framed imperatively*:*

> Certain of the Rules are explicit declarations of what an attorney can or cannot do. They are "cast in the terms 'shall' or 'shall not.'" Prof. Cond. R. Preamble, Scope. Some of these imperatives concern agreements that an attorney can or cannot enter into. The Rules at issue in this case (Rules 5.4(a) and 7.3(f)) are such imperatives. *Rules 5.4(a) and 7.3(f) are explicit judicial declarations of Indiana public policy and, akin to contravening a statute, agreements in violation of these rules are unenforceable.*

684 N.E.2d at 1153 (emphasis supplied).

The reasons for the general prohibition[5] against fee-splitting agreements are

detailed in *Trotter*:

> Rule 5.4(a) prohibits an attorney from sharing legal fees with a nonlawyer. This Rule states the public policy against fee-splitting with a nonlawyer. . . . [F]ee-splitting with a nonlawyer is disfavored because of its potential affect on the client-attorney relationship. For example, fee-splitting with a nonlawyer provides the incentive for a nonlawyer to recommend an attorney's services for their own pecuniary interests rather than the client's legal best interests. Furthermore, fee-splitting

---

[5]Rule 5.4 contains exceptions to the general prohibition, none of which apply to this matter. *See* R. Prof'l Cond. 5.4 (setting forth exceptions that pertain to payments following a lawyer's death and permit inclusion of nonlawyer employees in compensation or retirement plans).

5

provides a potential disincentive to the attorney to devote their full time and energy to the client, as the attorney must share fees with another who has done little to earn it. Finally, fee-splitting might interfere with the attorney's "professional independence of judgment." Thus, in general, fee-splitting agreements with a nonlawyer are contrary to Indiana public policy and unenforceable.

684 N.E.2d at 1154-55 (internal citations omitted); *accord O'Hara v. Ahlgren, Blumenfeld & Kempster*, 537 N.E.2d 730, 734-35 (Ill. App. 1989) (discussing "variety of harms" associated with fee-sharing agreements and recognizing that "[t]he public is best served . . . by [attorney] recommendations uninfluenced by financial considerations").

All decisions that involve issues of public policy have at their core a recognized need to act in furtherance of the public's interest. Observing the difficulty in formulating a precise definition of public policy, we articulated in *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984):

All are agreed that its meaning is as "variable" as it is "vague," and that there is no absolute rule by which courts may determine what contracts contravene the public policy of the state. The rule of law, most generally stated, is that "*public policy" is that principle of law which holds that "no person can lawfully do that which has a tendency to be injurious to the public or against public good * * *"* even though "no actual injury" may have resulted therefrom in a particular case "to the public." It is a question of law which the court must decide in light of the particular circumstances of each case.

*Id.* at 325, 325 S.E.2d at 114 (quoting *Allen v. Commercial Cas. Ins. Co.*, 37 A.2d 37, 38-39 (N.J. 1944 and emphasis supplied). That the prohibition of fee-sharing agreements between

6

lawyers and nonlawyers set forth in Rule 5.4 of the Rules of Professional Conduct is rooted in the need to protect the public from various potential injuries is clear. *See O'Hara*, 537 N.E.2d. at 734; *Trotter*, 684 N.E.2d at 1154; *see also Malevitis*; 710 N.E.2d at 847 ("A single focus animates our rules of professional conduct and the common law of this state: the client's best interest."). In view of this recognized need to protect the public from the harmful consequences of fee-sharing agreements, and like the majority of courts that have addressed the concerns at issue, this Court should have reached the conclusion that a fee-sharing agreement between a lawyer and a nonlawyer that is in violation of Rule 5.4 of the Rules of Professional Conduct is unenforceable as being contrary to the public policy of this state.

With regard to the trial court's concern that litigants may not rely upon the Rules in the course of civil actions,[6] this issue has been firmly rejected. In *Evans & Luptak,* the Michigan Court of Appeals considered the argument that the Michigan Rules of Professional Conduct could not be used as a defense to the plaintiff's breach of contract claim based on the provision within the rules which states that the rules "do not give rise to a cause of action for enforcement of a rule or for damages caused by a failure to comply with

---

[6]There is an obvious distinction between the concern expressed in the scope section of the Rules that they are not to serve as a *basis* for civil liability and the assertion by a defendant of a rule in *defense* to the enforcement of an allegedly illegal contract. The respondents neither sought to invoke the Rules as a procedural weapon nor to demonstrate the existence of a legal duty as a result of a breach of the Rules. *See* R. Prof'l Cond., scope.

an ethical obligation." 650 N.W.2d at 368 (discussing MRPC 1.0(b)). In rejecting the plaintiff's argument, the court specifically approved of the use of the rules "as a *defense* that the alleged contract is unethical because it violates our public policy as expressed in the Michigan Rules of Professional Conduct." 650 N.W.2d at 368 (emphasis in original). Similarly, the court rejected any reliance on the language which indicates that the rules are for disciplinary purposes only and that they may not be used to support or shield against civil liability. *Id.* at 369. As the court observed in *Evans & Luptak*, it would be absurd for the judicial system to assist a party to enforce an agreement that is in furtherance of a purpose which violates public policy. *Id.* Succinctly stated, "a party to a contract which is contrary to public policy is not precluded from raising its illegality as a defense." *O'Hara*, 537 N.E.2d at 738.

The fact that one party may benefit from an illegal fee-sharing agreement does not tip the proverbial scales of justice in favor of enforcement. As one court observed,

> Martello asserts that voiding these contracts would create a windfall for Santana at Martello's expense. This argument, while possibly true, is unpersuasive. The Rules of Professional Conduct were not created to protect non-lawyers who enter into contracts with attorneys, but were instead designed to ensure both that the judicial process is ethical and to protect potential clients.

*Martello*, 713 F.3d at 314; *accord Trotter*, 684 N.E.2d at 1155 ("[W]hen a court determines that a contract must be declared void as against public policy, it does so on the grounds that

8

the good of the public as a whole must take precedence over the circumstances of the individual, no matter the hardship or inequities that may result."); *see also Infante v. Gottesman*, 558 A.2d 1338, 1344 (N.J. Super. 1989) ("While we recognize that our decision may unjustly enrich defendant to the extent that he has received the benefit of any investigative and paralegal services performed by plaintiff, the pervasive proscriptions against such agreements require that we not render any assistance to these parties."); *O'Hara*, 537 N.E.2d at 737-38 (rejecting plaintiff's argument that lay persons be permitted to enforce fee-sharing agreement, stating that "[b]y refusing in every case to assist the lay party, courts may deter laypersons as well as attorneys from attempting such agreements" and "in this way, the public will be protected more effectively from the potential harms posed by fee-sharing agreements").

To borrow from the astute observation of an esteemed former member of this Court: "For the majority to completely fail to tackle at least an examination of the ethical considerations of the . . . fee [sharing agreement]. . . , undermines this Court's responsibility to uphold the ethical principles of the legal profession and sends the wrong message to the members of our Bar." *Bass v. Coltelli-Rose*, 207 W.Va. 730, 739, 536 S.E.2d 494, 503 (2000) (Scott, J., dissenting).

For these reasons, Justice Davis and I concur.

9