NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0439n.06

Case Nos. 20-5562/5563

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| OUTFRONT MEDIA, LLC, | ) | |
|     Plaintiff-Appellee, | ) ) | **FILED**<br>Sep 22, 2021<br>DEBORAH S. HUNT, Clerk |
| v. | ) ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| TERRI LEMASTER; PERFORMANCE MEDIA, | ) | COURT FOR THE EASTERN |
| LLC, | ) | DISTRICT OF KENTUCKY |
| | ) | |
|     Defendants/Third-Party Plaintiffs-<br>    Appellants, | ) ) | |
| | ) | O P I N I O N |
| RANDALL POWELL; BRENDA POWELL, | ) | |
|     Third-Party Defendants-Appellees. | ) ) | |
| | ) | |

**BEFORE: BOGGS, CLAY, and KETHLEDGE, Circuit Judges.**

**CLAY, Circuit Judge**. Defendants-Appellants Terri LeMaster and Performance Media, LLC, appeal the district court's grant of summary judgment to Plaintiff-Appellee Outfront Media, LLC, on its conversion claim. They also appeal the dismissal of their counterclaim for tortious interference against Outfront, the Kentucky Transportation Cabinet ("KYTC"), and Greg Thomas, in his official capacity as KYTC Secretary, as well as their third-party claims against Third-Party Defendants Brenda and Randall Powell. For the reasons stated below, we **AFFIRM** the district court's judgment.

## BACKGROUND

Outfront Media, LLC, owns and operates outdoor advertising devices throughout the United States. Performance Media, LLC, works in advertising sales, and Terri LeMaster is the company's sole owner. Between 1969 and 1973, Outfront Media's predecessor-in-interest,[1] National Advertising Company, entered into five leases with Mrs. Leonard ("Blanche") Powell, the owner of a farm located along Interstate 75 near Mount Vernon, Kentucky, to build and maintain five billboards on her property. National Advertising constructed the billboards, and, on September 9, 1983, it entered into new leases with Blanche Powell. The 1983 leases each had an initial term of ten years, a second term of ten years at National Advertising's option, and one-year renewal terms unless either party provided written notice of termination at least 60 days prior to each lease's anniversary date.

Under the 1983 leases, National Advertising paid $400 a year to Blanche Powell when the billboards were in an "advertising position." **(R. 100-3, 1983 Leases at PageID # 1472.)** In the event that "the highway view of the Lessee's displays is obstructed or obscured, or the advertising value of the displays is impaired or diminished, or the use or installation of such displays is prevented or restricted by law," National Advertising could terminate the leases with fifteen days' written notice. **(*Id.* at PageID # 1473.)** If any of the aforementioned conditions "temporarily exist," then National Advertising could, "at its option, instead of terminating this lease, be entitled to an abatement of rent payable" during that period, as well as a refund of rent paid in advance.

---

[1] The relevant chain of title for the billboards is as follows: (1) National Advertising Company entered into the 1969-1973 and 1983 leases with Blanche Powell; (2) Outdoor Systems, Inc., acquired National Advertising in August 1997 and took ownership of National Advertising's interests in the leases and billboards; (3) in February 2000, Outdoor Systems was renamed Infinity Outdoor, Inc.; (4) in August 2001, Infinity Outdoor changed its name to Viacom Outdoor, Inc.; (5) in December 2005, Viacom Outdoor changed its name to CBS Outdoor, Inc.; (6) CBS Outdoor converted to a limited liability company in June 2013; and (7) in November 2014, CBS Outdoor, LLC, became Outfront Media, LLC.

(*Id.*) And "[a]ll structures, displays and materials placed upon the said property by the Lessee are Lessee's trade fixtures and equipment, and shall be and remain the Lessee's property." (*Id.*)

Between July and September 1998, National Advertising's successor-in-interest, Outdoor Systems, Inc., renegotiated three of the five 1983 leases and left the other two 1983 leases in place. The 1998 leases had the same lease term structure as the 1983 leases, and termination was allowed by written notice of either party at least 90 days before the end of the lease term. Outdoor Systems agreed to pay Blanche Powell $675 per year for two of the leases and $900 per year for the third lease. Like the 1983 leases, the 1998 leases allowed Outdoor Systems to terminate the lease with fifteen days' written notice if the billboards were "entirely or partially obscured or destroyed" or Outdoor Systems was "prevented by government authority from constructing or maintaining such signs." (*Id.* **at PageID # 1475.**) If any of these conditions existed temporarily, then Outdoor Systems could abate the rent during the existence of the condition and have any rent paid in advance of the period returned. Under the 1998 leases, any "materials and displays" placed on the property by Outdoor Systems were "trade fixtures" and property of Outdoor Systems, and "Lessee's display(s) shall not be considered abandoned at any time and shall not become the property of Lessor except by express conveyance in writing." (*Id.*)

The 1983 and 1998 leases were binding on the parties' "heirs, successors, and assigns." **(R. 100-4, 1998 Leases at PageID # 1475;** *see also* **R. 100-3, 1983 Leases at PageID # 1473.)** And Blanche Powell was required to notify the lessee "of any change of ownership" in the farm and "give the new owner formal written notice of the existence of this lease." **(R. 100-3, 1983 Leases at PageID # 1473;** *see also* **R. 100-4, 1998 Leases at PageID # 1475.)**

The billboards were periodically inspected, and the 1993 and 1995 inspections indicated that the poles of the billboards were not in good condition. The 1995 inspection specifically

revealed that the poles had cracks; the walkways and the braces of the poles were not in good condition; the walkways were missing rails; and safety equipment needed to be installed.

On February 8, 2001, Infinity Outdoor, Outdoor Systems' successor-in-interest, wrote to Blanche Powell, informing her that Infinity was unable to sell advertising on three billboards located on her property that were blocked by vegetation and requesting that she have the trees cut back so that the billboards could be visible. The letter noted that lease payments had already been abated on two of the leases due to tree problems, and that, if the vegetation was not removed, then Infinity would have to similarly abate lease payments on the three additional leases. On May 30, 2001, Infinity informed Blanche Powell that the lease for the "Holiday Inn Express board" was "being changed to Hold Pay status" because trees had grown in front of it along Interstate 75. **(R. 100-7, Letter to Blanche Powell at PageID # 1495.)** On July 2, 2001, Infinity informed Blanche Powell that it was similarly abating rent on the leases for the "Meijer" and the "O'Charley's" boards. **(R. 100-8, Letter to Blanche Powell at PageID # 1497.)** Infinity urged her to contact her state legislators to inform them "that they are preventing you from receiving expected revenues by not allowing trimming of right of way trees along I-75."[2] (***Id.***)

On December 31, 2001, now renamed Viacom Outdoor, the company wrote to Blanche Powell that it was able to sell advertising space on one of the billboards, and it paid her the prorated rent amount for the seven months left on the lease term. Viacom said it would notify her as to whether the company would be able to continue lease payments in August 2002 and sell space on the other four billboards. Viacom also encouraged her to reach out to her state legislators and indicated that it was planning to lobby the state legislature in 2002 for a bill that would permit tree trimming. On June 7, 2002, Viacom informed Blanche Powell that the company had not been able

---

[2] Under Kentucky regulations at the time, "it was prohibited to cut vegetation on state right-of-way for the purpose of making a billboard visible." **(R. 100-9, Preece Dep. at PageID # 1506.)**

to acquire a sales contract for the following lease term and that rent for that lease, along with the four other leases, would be abated.

On November 30, 2001, Viacom placed four of the billboards on a "target list to remove." **(R. 100-14, Outfront's Continuous Call Reports at PageID # 1705–10.)** In August 2004, now renamed CBS Outdoor, the company requested that electricity be permanently disconnected from the billboards. On September 3, 2008, CBS Outdoor's real estate representative sent letters to its general manager "requesting termination" of the billboards, and, on January 7, 2009, CBS Outdoor sought a quote to terminate and remove the billboards. **(*Id.*)** No further steps towards removing the billboards were recorded, and the company did not end up removing the billboards. David Watkins, Outfront Media's Real Estate Manager, periodically inspected the billboards to see if there was any visibility from I-75. In 2010, Blanche Powell passed away, and her children, Randall and Brenda Powell, inherited her farm and the billboard leases. Randall tried unsuccessfully to notify CBS Outdoor of the change in ownership.

In November 2015, KYTC promulgated a new regulation, which provided that owners of off-premise advertising devices could exchange removal of six devices for receipt of one "new off-premise electronic advertising device permit." 603 Ky. Admin. Reg. 10:021 § 2(1). At that time, LeMaster wanted Performance Media to begin selling advertising on digital billboards, and she sought credits towards a permit for an electronic advertising device. On July 16, 2016, after seeing the billboards while driving on I-75, LeMaster visited the Powells' home and discussed removing the billboards in exchange for KYTC credits with Brenda Powell, who was under the impression that LeMaster was with KYTC.

The Powells set up a meeting with LeMaster on July 18, 2016, this time with Randall Powell in attendance, during which the Powells purported to transfer ownership of the billboards

to LeMaster. At this time, the Powells knew that Outfront had abated the lease payments for the billboards.[3] LeMaster submitted the signed forms to KYTC, and, on July 22, 2016, KYTC approved LeMaster's request to remove the billboards. Upon confirmation that they were removed, KYTC issued LeMaster four credits.[4]

In February 2017, David Watkins of Outfront Media sent a request for credits to KYTC for removal of the billboards. KYTC informed Watkins that the billboards had already been removed and that the credits had been claimed. After filing an Open Records Act request, Watkins learned that LeMaster and Performance Media received the credits for these billboards. Watkins then requested that KYTC put an immediate hold on the credits obtained by LeMaster and Performance Media.

Outfront's counsel sent a demand letter to LeMaster, explaining that Outfront, not the Powells, owned the billboards in question; Outfront had abated rent because the billboards became obscured; and at no point did Outfront terminate the leases. Outfront's counsel also informed LeMaster that the company intended to sue LeMaster and Performance Media for transfer of the credits and damages, but Outfront would not proceed with litigation if LeMaster transferred the credits to Outfront, which she refused to do. After Outfront's lawsuit was filed, KYTC denied LeMaster's application for an electronic advertising device permit because KYTC did not want to do anything further with the credits until Outfront's lawsuit was resolved.

Outfront filed the instant lawsuit against LeMaster, Performance Media, KYTC, and Greg Thomas, in his official capacity as KYTC Secretary, invoking diversity jurisdiction. Outfront

---

[3] During the second meeting, Randall Powell told LeMaster that the leases had been abated and that he had not been contacted by the lessee.

[4] LeMaster only received credits for four billboards because KYTC could not confirm the existence of a fifth, separate billboard.

asserted claims for conversion and tortious interference with contract, and it sought transfer of the credits as well as consequential and punitive damages. In LeMaster and Performance Media's amended answer, they included a counterclaim against Outfront, KYTC, and Greg Thomas for tortious interference with prospective economic advantage and sought punitive damages for transferring the credits at issue to Outfront. LeMaster and Performance Media also filed a third-party complaint against Randall and Brenda Powell for negligent misrepresentation and breach of contract, and they sought indemnity from the Powells for any damages arising from Outfront's suit.

Outfront, as well as LeMaster and Performance Media, filed motions for summary judgment on their claims. Outfront argued that: (1) LeMaster and Performance Media had converted Outfront's property—which it did not abandon by abating the rent or leaving the billboards in disrepair—and LeMaster had intended to interfere with Outfront's possession of the billboards, did not transfer the credits when asked to do so, and caused Outfront to lose their property; (2) LeMaster had committed tortious interference because Outfront had five active leases for the billboards, which LeMaster knew or should have known about, and LeMaster caused the breach by inducing the Powells to transfer ownership of the leases and allow her to remove the billboards; (3) Outfront was entitled to damages based on its net profits from what Outfront had made on its existing electronic billboards; and (4) LeMaster's tortious interference counterclaim failed because Outfront's communications with KYTC are protected by the judicial-statements privilege, and LeMaster could not make a sufficient showing as to the elements of a tortious interference claim.

LeMaster and Performance Media argued that: (1) Outfront had abandoned the billboards by abating rent, failing to maintain the billboards, failing to correspond with the Powells regarding

the lease abatements, and failing to get proper permits for the billboards; (2) LeMaster was a bona fide or good-faith purchaser for the value of the leases; (3) Outfront had not acted in a commercially reasonable manner based on the aforementioned conduct; (4) Outfront's conversion and tortious interference claims failed because it had abandoned the leases and failed to act in a commercially reasonable manner; and (5) they were entitled to summary judgment on the tortious interference claim because LeMaster had a valid contract for the billboards, and Outfront had interfered with that contract by requesting that KYTC place a hold on the credits.

The district court granted in part and denied in part Outfront's, as well as LeMaster and Performance Media's, motions for summary judgment. Finding that Outfront retained legal title to the billboards, the district court determined that Kentucky regulations on abandonment of billboards and permits do not affect ownership rights. The court found that the leases provided a broad authorization of abatement, and that the Powells could have terminated the leases. The district court also rejected LeMaster's argument that Outfront had an implied duty to develop and operate the billboards because the Powells could terminate the leases and because the leases protected against enforcement of implied terms. And the court determined that enforcing Outfront's leases did not violate public policy simply because the relevant Kentucky regulations incentivized removing old, nonconforming billboards owned by entities like Outfront.

The district court then determined that summary judgment to Outfront was proper on the conversion claim because Outfront easily established the remaining elements. The district court rejected LeMaster's bona fide purchaser defense because, as a matter of law, a purchaser's good faith is irrelevant when a seller lacks title. The district court denied summary judgment to Outfront and granted to LeMaster on the tortious interference claim because it found no triable issue regarding whether LeMaster had actual knowledge of the lease agreements between Outfront and

the Powells. Finally, the court denied summary judgment to LeMaster and Performance Media and granted to Outfront on their counterclaim because Outfront's assertion of its rights under the lease was not wrongful given that it had valid rights to the billboards. The district court concluded that Outfront was entitled to the credits, but that the issue of consequential damages must go to a jury.

Outfront filed a motion to voluntarily dismiss its claim for damages against LeMaster and Performance Media, which the district court granted. The court also dismissed LeMaster and Performance Media's third-party claims against the Powells. The court dismissed Performance Media as a party to the action for failing to retain counsel and prosecute the claims, despite being the real party in interest. The district court declined to exercise supplemental jurisdiction over LeMaster's third-party claims, given that the original claims, which were before the court under diversity jurisdiction, had been dismissed, and the third-party claims had not been active during the litigation. LeMaster and Performance Media subsequently moved for relief from judgment under Rules 59 and 60, which the district court denied. This timely appeal followed.

## DISCUSSION

### Standard of Review

"We review a district court's grant of summary judgment de novo." *McClellan v. Midwest Mach., Inc.*, 900 F.3d 297, 302 (6th Cir. 2018). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "At the summary judgment stage, the moving party bears the initial burden of identifying those

parts of the record which demonstrate the absence of any genuine issue of material fact." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389–90 (6th Cir. 2008).

Once the moving party has met its burden, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," although the evidence need not be "in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). All reasonable inferences are drawn in favor of the non-moving party. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007). When parties file cross motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

**Analysis**

The dispositive issue on appeal is whether the district court erred in finding that Outfront had legal title to the billboards; if not, summary judgment to Outfront on its conversion claim would be improper.[5] The intentional tort of conversion is defined as "the wrongful exercise of dominion and control over the property of another." *Jones v. Marquis Terminal Inc.*, 454 S.W.3d 849, 853 (Ky. Ct. App. 2014). Under Kentucky law, the elements of conversion are:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the

---

[5] Relatedly, LeMaster contests the ownership of the billboards by Outfront's predecessor, Outdoor Systems; however, this argument is not properly before this Court because LeMaster did not substantiate this argument at summary judgment, instead waiting until her Rule 59 motion to do so. *See Evanston Ins. Co. v. Cogswell Prop., LLC*, 683 F.3d 684, 692 (6th Cir. 2012) ("Arguments raised for the first time in a motion for reconsideration are untimely and forfeited on appeal.").

plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*C&H Mfg., LLC v. Harlan Cnty. Indus. Dev. Auth., Inc.*, 600 S.W.3d 740, 745 (Ky. Ct. App. 2020) (emphasis omitted). On appeal, LeMaster focuses her arguments on the element of legal title.

### A. Illegal Purpose of the Leases

LeMaster first contends that Outfront's legal title to the billboards is invalid because the billboards had an illegal purpose, having been in violation of the Billboard Act since 2003 when none of the billboards displayed any current advertising material.[6] The Supreme Court of Kentucky has stated that "a court may refuse to enforce a contract on grounds of illegality where the contract has a direct objective or purpose that violates the federal or a state Constitution, a statute, an ordinance, or the common law." *Yeagar v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005). We have said that a purpose may be illegal if it violates administrative regulations promulgated pursuant to legislation. *See Martello v. Santana*, 713 F.3d 309, 313 (6th Cir. 2013). In *Martello*, we found that an attorney's fee-sharing agreement, in which the attorney shared legal fees with a law graduate who was not admitted to the bar, was void because it violated the provision in the Kentucky Rules of Professional Conduct that prohibits sharing legal fees with non-lawyers. *Id.* at 313–14. Similarly, in *Bassett v. National Collegiate Athletic Association*, we concluded that an agreement between a former University of Kentucky football coach and the Athletic Director to refrain from reporting misconduct was void for violating public policy because "contracts that require an employee to breach his fiduciary duty to his employer are illegal and void under Kentucky law." 528 F.3d 426, 438 (6th Cir. 2008) (internal quotation marks and citation omitted).

---

[6] LeMaster's argument regarding the billboards having been illegal when they were first installed is forfeited on appeal because LeMaster failed to raise the argument before the district court at summary judgment. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[A]n argument not raised before the district court is waived on appeal to this Court.").

Kentucky regulations of static advertising devices provide that "[t]he erection or existence of a static advertising device shall be prohibited in a protected area if the device . . . [i]s abandoned or discontinued." 603 Ky. Admin. Reg. 10:010 § 1(4)(b).[7] An advertising device is abandoned or discontinued if, for a year or more, it has (1) "[n]ot displayed advertising matter;" (2) "[d]isplayed obsolete advertising matter;" (3) "[n]eeded substantial repairs due to lack of maintenance;" or (4) "[o]nly advertised for the sale, rent, or lease of the advertising device." 603 Ky. Admin. Reg. 10:002 § 1(1).[8] However, the regulations allow owners of "currently nonconforming" or "illegal" off-premise advertising devices to exchange these devices for credits towards a permit for an electronic advertising device. 603 Ky. Admin. Reg. 10:021 § 2(1), (3).

Under the regulations, the billboards were administratively abandoned and prohibited by law in 2003 because they either lacked advertising or displayed obsolete advertising and because they needed substantial repairs. *See* 603 Ky. Admin. Reg. 10:002 § 1(1). But the leases themselves did not have an illegal purpose because it was not the direct objective or purpose of Blanche Powell or Outfront's predecessors in entering these leases to maintain billboards that were illegal under Kentucky regulations. *Cf. Bassett*, 528 F.3d at 438 ("Bassett's admitted knowledge of self-reporting obligations of himself and Ivy, coupled with his admission that he violated NCAA rules, necessarily renders any agreement to circumvent those obligations, in order to suppress discovery of Bassett's improprieties, void."). No provision of the leases required either party to violate any

---

[7] This section was repealed and moved to 603 Ky. Admin. Reg. 10:040E.

[8] The regulations allow a nonconforming static advertising device to exist without a permit if it is: (1) "[n]ot abandoned or discontinued;" (2) "[s]ubjected to only routine maintenance;" (3) "[i]n compliance with state law and administrative regulations as well as local zoning, sign, or building restrictions at the erection;" and (4) "[s]ubstantially the same as it was on the effective date of the state law or administrative regulation that made the device nonconforming." 603 Ky. Admin. Reg. 10:010 § 4(1). A nonconforming advertising device is an "an off-premise advertising device that at one (1) time was lawfully erected but does not comply with a . . . [c]urrent state law or administrative regulation . . . ." 603 Ky. Admin. Reg. 10:002 § 1(23). Outfront agrees that the billboards were nonconforming as of 1976.

of the Kentucky billboard regulations—the leases even allowed for termination if "the use or installation of such displays is prevented or restricted by law or by the Lessee's inability to obtain any necessary permits or licenses." **(R. 100-5, Leases in Effect in 2016 at PageID # 1483.)**

Additionally, KYTC anticipated that owners would retain possession of nonconforming and illegal billboards by allowing owners to exchange such billboards for credits towards an electronic billboard permit. *See* 603 Ky. Admin. Reg 10:021 § 2(3), (6) ("An off-premise advertising device to be exchanged shall be . . . [c]urrently nonconforming . . . or [i]llegal. . . . The owner of an exchanged advertising device shall receive credit by the department for each advertising device removed after the effective date of this administrative regulation."). And the regulations do not require that billboards deemed to be administratively abandoned be removed or for their ownership to be transferred to the lessor, opting instead for forfeiture, potential legal action, and fines. *See* 603 Ky. Admin. Reg. 10:010 §§ 8–9. This provides further support for the fact that KYTC anticipated that entities like Outfront would retain ownership of "illegal" billboards and that such ownership does not seriously offend the Kentucky regulations on billboards. Accordingly, the billboard leases are not void for advancing an illegal purpose.

**B. Unenforceability of the Leases After Outfront Stopped Using the Billboards**

LeMaster then raises several arguments related to why the leases became unenforceable once Outfront stopped using the billboards to display advertising materials. The first of these arguments is that, because the billboard leases were for the stated purpose of displaying advertising material, once they were no longer used for that purpose, the leases became unenforceable. LeMaster relies on two Kentucky Court of Appeals cases to support this argument: *Hite v. Carmon*, 486 S.W.2d 715 (Ky. Ct. App. 1972), and *Lavit v. Mattingly*, No. 2014-CA-001676-MR, 2016 WL 4256911 (Ky. Ct. App. Aug. 12, 2016).

In *Hite*, the contract at issue involved a lease between Mary Hite and Sun Oil Company, in which Sun Oil leased two acres of Hite's real property to be used for its oil business and Sun Oil could renew the lease term annually at its option. 486 S.W.2d at 716. After the company stopped using the property for the oil business and assigned the lease to employees who used it for residential purposes, Hite sought to terminate the lease because the property was not being used for its stated purpose and the assignments occurred without notice to Hite. *Id.* The court found that Hite could terminate the lease under these circumstances because "[t]he law does not favor perpetual leases," and the lease was intended to be limited to use of the property in connection with the oil business. *Id.* at 717. On the other hand, in *Lavit*, the court upheld a lease it interpreted as allowing for multiple renewals of the lease by the tenant so long as the premises continued to be used as a law office. 2016 WL 4256911, at *5.

In the present case, the billboard leases allowed Outfront to occupy the allotted portion of the Powells' farm "for the purposes of erecting and maintaining advertising displays." **(R. 100-5, Leases in Effect in 2016 at PageID # 1482.)** However, while the leases allowed for yearly renewals at Outfront's option, unlike in *Hite* and *Lavit*, both Outfront and the Powells had the ability to terminate the lease. Additionally, the billboard leases accounted for what would happen if the purpose of the agreements—to display advertising materials—were frustrated, by allowing Outfront to terminate the lease or abate rent. Outfront followed the protocol laid out in the lease and abated rent during the time that the billboards were obstructed. And, unlike *Hite*, in the present case, Outfront did not attempt to use the billboards for an unauthorized purpose. *See* 486 S.W.2d at 716. In fact, KYTC regulations prohibited Outfront from making the necessary repairs and removing obstructive vegetation to be able to use the displays as intended. *See Whiteco Metrocom Corp. v. Commonwealth*, 14 S.W.3d 24, 27 (Ky. Ct. App. 1999) (noting that Kentucky law

"permits nothing other than routine maintenance" of nonconforming billboards). Accordingly, the leases did not become unenforceable based on Outfront's inability to sell advertising on the billboards.

LeMaster next argues that the leases were not enforceable because it became impossible or impracticable to use the billboards for advertising displays given that the billboards were illegal under Kentucky regulations and the billboards had severely deteriorated. But, regardless of whether the Kentucky regulations made Outfront's inability to put up advertising displays impossible or impracticable, the lease agreements accounted for Outfront's inability to put up advertising displays on its billboards by allowing Outfront to terminate the lease or to abate rent, if, for example, the use of the displays became illegal or the displays were obstructed. Given the regulations preventing the repair and removal of obstructions for nonconforming billboards, Outfront decided to abate the rent for the billboards pursuant to the lease agreements. And, again, the Kentucky regulations contemplate that entities like Outfront owning nonconforming or illegal billboards can exchange their removal for credits towards an electronic advertising device, so that Outfront could still enforce its ownership of the billboards pursuant to the lease agreements. *See* 603 Ky. Admin. Reg 10:021§ 2(3), (6). As a result, the leases were not unenforceable based on impossibility or impracticability.

LeMaster's final argument as to why the leases are unenforceable is that Outfront breached the agreements when it failed to pay rent for more than thirteen years; therefore, it cannot enforce the lease agreements now. Although the lease agreements explicitly provide for the abatement of rent under certain circumstances—and Outfront followed the proper protocol for seeking abatement of the rent—LeMaster contends that abatement of the rent was only allowed under the

lease agreements for "temporary" conditions and that a thirteen-year tree obstruction was a "condition of indefinite duration." **(Appellants' Br. 24.)**

Kentucky law provides that written terms in a contract should be "enforced strictly," assuming the language is unambiguous, and words in a contract should be read pursuant to their "ordinary meaning." *Stowe v. Realco LLC*, 551 S.W.3d 462, 465–66 (Ky. Ct. App. 2018) (internal quotation marks and citations omitted). In interpreting contracts, courts should seek to "give effect, if possible, to the mutual intention of the parties," and words in the contract should be "construed in the sense they are employed by the parties." *N. Star Co. v. Howard*, 341 S.W.2d 251, 255 (Ky. Ct. App. 1960). "The interpretation of a contract is a question of law." *Stowe*, 551 S.W.3d at 465.

Here, the leases do not provide a separate definition of the word "temporary" as used in the termination and abatement provision. **(R. 100-5, Leases in Effect in 2016 at PageID # 1483.)** The ordinary meaning of the word "temporary" means a condition lasting for a limited duration and not permanently. Considering the word in the context of this provision, the district court correctly construed the term to allow Outfront discretion in abating the rent pursuant to one of the triggering conditions. The lease agreements permitted Outfront to terminate the leases based on the existence of one of several conditions, including obstruction of the displays, diminished advertising value, legal restrictions, inability to obtain advertising contracts, or a diversion of traffic. And the lease specifically provided Outfront the option to abate rent when any of the above conditions temporarily existed for the duration of the condition's existence. Given this language and the lack of a specific limitation on the time period during which abatement of rent could last, this provision demonstrates an intent by the parties to allow Outfront to end or pause obligations under the lease pursuant to conditions outside of its control.

Thirteen years may seem a long period of time, but a thirteen-year tree obstruction is temporary insofar as the trees could have been removed at any time during that period by human intervention, the state government, or even natural disasters. Had Kentucky amended its regulations to allow for more than routine maintenance of nonconforming billboards, Outfront could have removed the vegetation obstructing the displays, and Outfront had been lobbying the Kentucky Legislature to amend their regulations. Given its hope that the regulations would be amended, the company properly abated rent until such time as the vegetation could be removed. And if the Powells believed that abatement was improper because the obstruction was a permanent condition, they could have terminated the lease prior to the next renewal date. Outfront did not breach the leases by abating the rent pursuant to the temporary condition of vegetation obstruction.

## C. Abandonment of the Billboards

LeMaster contends that Outfront abandoned its ownership of the billboards by allowing them to fall into disrepair.[9] Kentucky courts define abandonment of property as "the relinquishment of property with the intention of not reclaiming it or reassuming its ownership or enjoyment." *Kelley v. Nationwide Auto Restoration, LLC*, 246 S.W.3d 470, 473 (Ky. Ct. App. 2007). The elements of abandonment are (1) "a voluntary relinquishment of possession" and (2) "intent to repudiate ownership." *Greer v. Arroz*, 330 S.W.3d 763, 765 (Ky. Ct. App. 2011). In determining whether an owner has abandoned property, Kentucky courts look to "the conduct of the parties, independently of what they may claim was their mental attitude with respect thereto." *Cameron v. Lebow*, 338 S.W.2d 399, 406 (Ky. Ct. App. 1960) (internal quotation marks omitted),

---

[9] LeMaster contends that photos of the billboards at the time they were taken down demonstrate that the obstructions in front of the billboards had been removed sometime between 2002 and 2016. However, the district court properly rejected the photos as not creating a genuine dispute of material fact regarding the visibility of the displays, given that the photos were taken from a side road and LeMaster failed to identify where and when the photos were taken.

*overruled on other grounds as recognized in Carrs Fork Corp. v. Kodak Mining Co.*, 809 S.W.2d 699 (Ky. 1991). An "intent to repudiate ownership may be inferred when the facts justify it, and the lapse of a long period of time following relinquishment of possession constitutes significant evidence of the intention to abandon property." *Kelley*, 246 S.W.3d at 473. An owner who has abandoned property cannot pursue a conversion claim for it, *C&H Mfg.*, 600 S.W.3d at 746, because "the completed act of abandonment itself terminates the leasehold interest." *Cameron*, 338 S.W.2d at 406.

The Kentucky Court of Appeals "has previously recognized a presumption of abandonment when a commercial tenant turns over its lease to another commercial tenant in the same business and leaves behind equipment or personal property." *C&H Mfg.*, 600 S.W.3d at 746. In *C&H Manufacturing*, the Kentucky Court of Appeals determined that C&H Manufacturing abandoned its equipment after leaving it at the facility it had previously leased and failing to retrieve or make a demand for the equipment in the eight to nine years between leaving the lease and filing the underlying complaint. *Id.* at 747. Similarly, in *Goss v. Bisset*, the previous tenant and the current tenant both ran garage businesses, and the previous tenant left behind equipment following the end of their lease, for which they never returned. 411 S.W.2d 50, 53 (Ky. Ct. App. 1967). Given that the lessor had no ownership interest in the equipment, and "[p]ossession passed directly and immediately from one tenant to the other," the court determined that the previous tenant intended to abandon the equipment. *Id.* at 53–54. And, in *Greer*, the Kentucky Court of Appeals determined that former homeowners abandoned their personal property left at the home after failing to make any demand for the property until four years after the home's judicial sale. 330 S.W.3d at 765–66.

In the present case, Outfront did not abandon the billboards, and any conduct that might, at first glance, seem to show an intent to abandon the billboards was not voluntary on the part of Outfront. Considering the various lease agreements for the billboards, the three 1998 leases explicitly provide that the billboards "shall not be considered abandoned at any time and shall not become the property of [the Powells] except by express conveyance in writing." **(R. 100-5, Leases in Effect in 2016 at PageID # 1486.)** Additionally, the 1983 and 1998 leases remained in effect until either party provided written notice of termination at least 60 or 90 days, respectively, before the start of the next lease term, which neither party did. All the leases contemplated obstruction of the billboards and allowed for Outfront to terminate the rent, or to abate rent payments when such an obstruction occurred temporarily.

LeMaster's contention that Outfront abandoned the billboards by failing to sell advertising on any of the five billboards since 2002 and failing to maintain the billboards ignores the fact that these consequences were the result of Kentucky regulations, not Outfront's voluntary conduct. Prior to 2015, Kentucky law prohibited cutting down vegetation in front of a billboard on a state right-of-way to make the billboard visible. *See Whiteco Metrocom Corp.*, 14 S.W.3d at 27. Outfront lobbied the Kentucky Legislature to change the law so that Outfront could remove the vegetation from in front of the billboards, but it was not successful until 2015 with the promulgation of 603 Ky. Admin. Reg. 5:155. Until then, Outfront could not sell any advertising because the view of the billboards remained obstructed, and it could not remove the obstruction because that exceeded the scope of any routine maintenance on the billboards. *See Whiteco Metrocom Corp.*, 14 S.W.3d at 27 (noting that routine maintenance of nonconforming advertising devices included "replacement of nuts and bolts, nailing, riveting or welding, cleaning and painting, or manipulating to level or plumb the device;" "the routine change of message;" and

"[t]he lamination or preparation of existing panels or facings at a location other than that of the advertising device").

In the aforementioned cases where the Kentucky Court of Appeals has found abandonment of property, the previous owners left behind the personal property at the close of their lease term or ownership of the real property, which constituted an act voluntarily relinquishing the personal property and intending to repudiate their ownership in that personal property. *Cf. C&H Mfg.*, 600 S.W.3d at 746–47. In contrast, in the present case, Outfront maintained valid leases for the area on which the billboards were built at the time that the Powells purported to transfer ownership of the billboards to LeMaster, and it neither attempted to remove the billboards at any point nor otherwise took any action that would indicate either voluntary relinquishment or an intent to repudiate ownership of the billboards. As a result, the district court correctly found that Outfront did not abandon the billboards.

Outfront retained legal title to the billboards at the time that the Powells purported to transfer ownership of the billboards to LeMaster because, as a matter of law, the leases were enforceable and Outfront did not abandon the billboards. Given that on appeal LeMaster contests only the district court's conclusion regarding the legal title element of Outfront's conversion claim, we will not disturb the district court's finding that Outfront sustained its burden on summary judgment to establish all of the conversion elements as a matter of law.[10]

---

[10] Because we affirm the district court's grant of summary judgment to Outfront on the conversion claim, we similarly affirm its denial of summary judgment as to LeMaster on her counterclaim regarding tortious interference with prospective economic advantage. Outfront's assertion of its rights under the lease agreements was not improper, and LeMaster cannot make out a tortious interference claim without showing that Outfront acted wrongfully. Additionally, LeMaster does not contest the district court's exercise of discretion to decline supplemental jurisdiction over LeMaster's third-party complaint against the Powells on appeal. Therefore, we also affirm the district court's dismissal of the third-party complaint.

## CONCLUSION

For these reasons, we **AFFIRM** the district court's judgment.